Nguyen v. Travelers. I'm representing the appellants and with me here is Gabriel Verdugo, my colleague. I will be handling this oral argument, which concerns direct physical loss of property, civil authority, and the virus exclusion. And Mr. Verdugo will be handling the remaining two oral arguments because he is twice the advocate that I am. So as Judge Kristen pointed out, about a month and a half ago in late June, the Washington Supreme Court heard a case called Hill and Stout, which raises actually exactly the same issues that I am arguing in this oral argument right now, those three that I just mentioned. So can I begin by asking, is there any reason that we should not be waiting for the Washington Supreme Court's decision? I have a very hard time thinking of one, Judge Berzon. We're going to take that as a no unless you can think of one. Just to be clear, because this is a lot of cases. Yes, I don't see a reason that this court should not stay its hand until the Washington Supreme Court issues a decision in that case. So we weren't telegraphing anything by having argument this week, except that it's not easy to get three circuit judges assigned to a case in the same place at the same time. And we were going to be here. Of course. So we don't want to have to have unnecessary delay on the back end. Yes. And we're here. But otherwise, yes, we understood that. And I think you've answered and confirmed that in response to Judge Berzon's question. Yes. And just, you know, this may be saying something that all three of you already know, but, you know, we had moved to stay this case, this appeal, a little bit earlier in the life of this appeal. And that was denied with, of course, the invitation that we renew it in front of the merits panel. So that is what I am doing now. As I say, I think the delay will be minimal. Delay by itself under this court's decision in CMAX, which we cited in our motion to stay, is not by itself a reason to deny a stay. This court, once the Hillenstau decision comes out, will have the benefit of a definitive decision by the final word on Washington law. So this court won't have to make an eerie guess. Can I ask one related question? Of course. Does the Washington Supreme Court have a deadline of decisions the way the California Supreme Court does, or do we know when it will come out? Not that I'm aware, Your Honor. What I can say, having some experience with the Washington Supreme Court, is the following, is that the more unanimity there is, the sooner it comes out. That's probably no surprise to this panel, but that is the way it usually works. I mean, the irony, I suppose, is that to the extent that my friend on the other side believes that this is an easy case, then the Washington Supreme Court should not have a very hard time resolving it and should come out with a decision soon. But having said all that, unless this court has other decisions about the stay itself, I can turn to the merits. I think that's right. Okay. Thank you very much. So I think the key question, the first question, is what distinguishes this case from the Mud Pie case? And I would point to two things. From the which case? The Mud Pie case? Okay. Yeah. First, in Mud Pie, this court was deciding under California law. I'm not pointing to that by itself, of course, merely. I am pointing to the fact, however, that under California law, by the time the Mud Pie decision came out, there was a decision from the California Court of Appeal called MRI healthcare, which I think was more or less dispositive of the legal argument in that appeal. Here, by contrast, I don't think we have a Washington precedent that is quite on all fours with this case. I think the second reason that there's a distinction here is that there are some unique precedents in Washington law that, as far as I'm aware, are absent from California law. And those, I think, the ones I'd point to, for purposes of this argument at least, are both cited in our briefs, and that's NEAR v. Fireman's Insurance and Boeing v. Aetna. So NEAR is, I will admit, a factually different case. It dealt with an insurance policy that insured the loss of both feet. The facts are a little ghastly. The insured fell from a tree and left him paralyzed below his mid-back. And the policy defined loss as the complete severance through or above the ankle joint. Now, what's interesting is that the evidence conflicted, actually, on whether the spine had actually been severed. Nevertheless, the Washington Supreme Court held that a loss had occurred because loss, it said, meant loss of use or function. So I think the case is illuminating because you see the Washington Supreme Court saying, well, loss means loss of functionality, which is more or less what we are trying to argue here. A point, I suppose, another way of saying it is simply that Washington law is inclined to read loss as loss of use. But just to build on that example, it also says physical loss. That was a physical something. Whether it was a loss or not is a different question, but it was a physical something. Indeed, indeed. And, you know, that is certainly the insurer's argument, that we don't deal with the modifier physical. I think that's false. And the reason is that the loss that we are pointing to was a restriction on the physical functionality of, in this case, the WEN case, the dentist's office, and some of the other cases. Of the premises. Of the premises, of the physical premises. Because you couldn't access them. Well, that's correct. We couldn't access them for normal business. That's correct. And so I think that. But even that, you could access them, right? I mean, even that's a problem. It would be one thing if there was. And in all the cases that we have, you know, there's sort of shades of gray about whether takeout was still available. And using that term, I don't know if you can apply that really to a dentist's office, but it wasn't the case, factually, that your clients were really prevented from entering, right? That is true. They weren't physically barred from entering. However, there were limitations on the normal physical functionality of the space by law, or actually by decree. Of what they could do in there. Of what they could do in there. Or why they could be in there. And why they could be in there and what they could do with the space. And so the normal functionality was lost. I think the case is even clearer for those of these cases that involve restaurants, where there was simply no in-house dining, for example. And I think, you know, I think there's something of a clue, I think, in the fact that the loss of income provision is tied to a suspension of business. And suspension of business is defined in the policy as a total or partial cessation. So to me, that is a clue that access doesn't need to be completely barred for there to be an insurable loss under the policy. To get back to the other point of Washington law that I think is unique here, it's Boeing v. Aetna. It's a case that we just, you know, describe at length in our briefs. And so I'll simply say that that, I think, stands for the proposition that you can't infer a limitation on coverage when such a limitation doesn't appear where you would believe it would appear, i.e., either under the limitations, which is to say limitations as opposed to exclusions. Limitations would be, say, limitations on the extent of coverage in terms of, like, how much money they will pay out, exclusions in terms of what will be insured. When neither of those, I think, when the limitation on coverage is to be inferred from neither of those, as is the case here, I think that that is, you know, that is a, the Washington Supreme Court says, essentially, that you can't infer from the definition of period of restoration. And that's what I'm trying to get at. I should have started with that earlier, actually. Period of restoration, of course, is another thing that the Mud Pie Court relied on fairly heavily. And in fact, you know, I'll concede, I think that that's their strongest textual argument for their reading of direct physical loss. Because something needs to be restored. Right. Some physical thing needs to be restored. That because the, it talks about repaired, rebuilt or replaced, that you can infer that there needs to be some sort of demonstrable alteration. And that's in the provision that deals with business losses, essentially. That's correct. That's correct. It says that business losses will be covered for the period of restoration. But your clients, if we're talking about, are going to talk about dental offices or restaurants, dental offices? When is a, they're dentists. Okay. So, right. So, we can use that example. You just went to restaurants for a minute there before me, but that's fine. Right. So, how, as we indicated just a minute ago, you said, well, you know, the premises were closed, but not really closed. You could access them. So, when you get to this part, it seems to me your argument gets to be really tough sledding. Right. What had to be restored? Yes. So, I think that. Because you're not claiming, forgive me for interrupting you. You're not claiming the virus was on your premises, right, in the same way that asbestos could be or smoke damage or something. Right. Okay. There's no evidence that it was on the premises. You know, I think our basic argument there is that if you read loss of use as it can be read reasonably to mean, excuse me, direct physical loss to mean loss of physical functionality, then under Washington canons of insurance interpretation, you know, should take on a correspondingly broad meaning. And restored, repaired, rebuilt, if construed broadly enough, can reach this sort of case. Meaning that your ability to use the premises is restored? Right. Precisely. All right. Precisely. But if you don't buy that, I think that we could still have coverage under the civil authority provision. And that's because the civil authority provision rests on physical loss or damage to nearby property. Depends on the insurance policy and when. For example, it's within 100 miles. Some is within a mile. But there has to be direct physical damage or loss to property other than the insured property that then causes access to the insured property. But insurance is the same problem with regard to the other property. There has to be physical loss to those properties. Because you think some of them may have actual COVID and that's the reason. That's correct. That would be the theory. The alternate argument here is that the physical presence of COVID constitutes physical damage in the same way contamination by a chemical or by radiation would constitute. But then you have a virus exclusion. Correct. And so let's talk about that. Let me begin, though, by just pointing out that not all of these cases before you all have virus exclusions. That being said, I think I have two arguments for why the virus exclusion can be read not to apply here. Or at least raises a question of fact that needs further development. The first is that the orders issued by the state of Washington weren't dependent on the presence of COVID in the shutdown premises. The orders lasted as long as. I understand that. But and the virus, how the virus exclusion applies to the direct physical loss is one thing. But you're now trying to use the presence of the virus in other properties as for the civic civic authority provision. So the question isn't whether there is a president. So the only way you can do that is if there is a presence of virus on those. And then why don't you have a virus exclusion as to that? That is correct. Our point, however, is that the presence of the virus on those other in those other properties was mediated, as it were, through this government order of shutdown. So even if there is even if there was the presence of the virus in those other properties, it didn't dictate the issuance of these of these shutdown orders. In fact, in some ways, I think it gives the the the government not enough agency or credit for for deciding to shut down these places for the first for safety. They are making the proximate cause argument. Yeah. But proximate cause doesn't mean dictated. It doesn't have to be dictated. That's true. Proximate cause is but for. But here, of course, we have efficient proximate cause, which is a different standard than but for. But it still doesn't have to be dictated. I mean, it has to it has to be the predominant cause, however. And so set other causes in motion. Right. Well, I think that that even if and I think the efficient proximate cause argument is really tough for your team. So I don't know if I don't mean to take you down that trail. I just gave you a fair read because it's your time to use. No, I. I really appreciate that. Thank you. And actually, that is a good cue for me to, I think, save the rest of my time. OK. I didn't mean to. Thank you. Can I ask you one before you sit down? We're talking a lot about issues that ultimately it seems the Washington Supreme Court will decide. So what I need to know from you and from everybody today really is what issues are remaining? Assuming the Washington Supreme Court takes those sort of main premise. What else is remaining that you think you need a separate decision from us on? Well, conceivably, there are some exclusions at issue in some of these cases that I don't believe are an issue in Hill and Stout. But that only matters if there's coverage in the first place. Correct. But this set of questions we were just talking about. Those are all present. Including the virus. Absolutely. All of them are present. And in fact, Hill and Stout involves a dentist's office. So pretty on point. I think there are four cases where there isn't a coverage exclusion. The majority of them have a coverage exclusion. But I think there are four that do not. That is correct. I think the list, my list, is cases where at least a virus exclusion isn't present or the insurer hasn't raised it on appeal is Seattle Symphony, Marler v. Aspen, La Cocina, Chorack v. Hartford, McCulloch v. Valley Forge. And I'm not sure this is one of the stayed cases here or if it's a separate case. But an appeal called Neighborhood Grills. Neighborhood Grills. Yeah. Okay. Thank you. Thank you. Thank you. May it please the Court. Stephen Goldman representing Travelers. And maybe I'll start with the Court's first question of counsel for the appellant is why should you not wait for the Washington Supreme Court? And I just note clearly this is within the Court's discretion. But there are several other circuits that did move forward despite cases pending before the State Supreme Court. The Sixth Circuit did that in Santos. The Tenth Circuit did it with issues. In the Sixth Circuit, there were issues. The case was framed before the Ohio Supreme Court. The Tenth Circuit, the case was framed before the Oklahoma Supreme Court. Already argued? Not the Sixth Circuit. Excuse me. The Sixth Circuit's initial decision in Santos had not been the case was pending but had not been argued. But then the Sixth Circuit has continued to issue subsequent decisions applying Ohio law after the Neuro, I can't remember the full name of the case, but Neuro something or other was argued in front of the Ohio Supreme Court. In the Tenth Circuit in Oklahoma, they don't have oral argument. But the issues had been pending before the Oklahoma Supreme Court for quite some time. The Fourth Circuit issued its decision in the Uncork case and in another case applying North Carolina law while the issue was pending before the North Carolina Court of Appeals. Excuse me, I'm sorry. You seem to be suggesting a preference that we do go ahead. I wonder why. You seem to be suggesting a preference that we go ahead. But we go ahead and then the Washington Supreme Court decides the opposite. That's positive. And what's the point? No, that's an excellent question, Your Honor. And the only point is it's the lay of all the cases that are sitting in the system. But what's going to happen next? Suppose we decided it and suppose we decided it really quickly in a month. And then there's a petition for a re-hearing and then what? I mean, we're still and even if we were to decide it, you think it would be a race to Ducati even if we were flat wrong at that point in terms of the Washington Supreme Court? There doesn't seem to be any point to it. Well, I think the court needs to weigh the probability that the Washington Supreme Court would decide this differently than 70. I think it's now exceeded 75 appellate cases throughout the United States that have addressed this issue, including all of the other circuits except the third that hasn't reached it, including five state Supreme Courts and six or seven different intermediate appellate courts applying the law of approximately 20 states. So just how likely is that is the question the court has to weigh. And is there anything in the Washington case? For example, you just made this fairly intricate argument about the civil authority provision and the virus exclusion. And apparently there are some of these policies don't have virus exclusions. I gather there is one here, but there is in some other cases. So conceivably that could come out differently than on that basis. And I don't know whether all of these other cases had that feature. Some of them may have, some of them may not have. So there is enough variation here. But I gather the case in the Washington Supreme Court does have all of those features. It has many of them. It doesn't have all of them. I think some of the exclusion, I mean, as I think counseled correctly, but not some of the exclusions raised in these cases are not present. But it certainly has the direct physical loss issue and it certainly has the virus application, the virus exclusion issue. The civil authority issue, as Your Honor pointed out, with cases with a virus exclusion, even on the plaintiff's argument, taking it as gospel, falls right into the jaws of the virus exclusion. If the theory is that the damage to the other properties that caused the orders, that caused the restriction on the use of these insureds was caused by a virus, if that's the theory, then it's clearly barred by the virus exclusion, even under the plaintiff's argument about the scope of the virus exclusion. But even without a virus exclusion, which is not the issue in this case, in this particular case, the Nguyen case against travelers, there are virus exclusions in all of these cases. But even if we didn't have the virus exclusion, they still would have to prove that the orders, that there was physical loss or damage to these other properties. They haven't pled that. They haven't pled specifically there was virus on specific other premises. They haven't pled. And then when you look at the orders themselves, there's nothing suggesting they were issued because of physical loss or damage to other properties. And numerous courts, including this court in Saline Products, found that to be fatal to the civil authority claim. So I don't think under the allegations of these complaints in these cases, there's any more likelihood that the plaintiffs would prevail under civil authority provisions than any of the other provisions they're claiming here. Went ahead and mudpied. We had more California law, and we didn't have a situation where the California Supreme Court had heard argument and we were awaiting a decision. And it is a surety that if we were to come out differently on these issues, differently than the Washington Supreme Court, there would be a whole lot more litigation. Right? We would make a mess. Well, you'd have motions to reopen judgments. Yes, yes, yes, a whole lot. And it affects a lot of cases. So we have to weigh that balance, and we do that, and come out differently in different cases under different circumstances. But I wonder if you want to discuss the merits of your argument. Absolutely, Honor. Thank you. So obviously this Court's well aware of the Court's decisions in Mudpie and Saline Products and Chattanooga. Since at that time there was only one case pending in the – or one appellate case in the country that had addressed these issues, and that was just the direct physical loss issue, and that was the oral surgeons case. Since then, all of the other circuits, as you mentioned, except the third and the D.C. circuit, which would be – But it would be helpful to actually discuss the issue as opposed to flagging the authority. I'm sorry? It would be helpful to me to actually discuss the issue as opposed to telling me how many cases have come out. Of course. All right. All right. So the question then is because – is there anything in Washington's case law or otherwise that would suggest a different result? Well, there's nothing in the Washington case law that would suggest a different result. The Seattle Tunnel case clearly specifically said that a loss of use is not direct physical loss. The cases in – the Supreme Court's case in Villela and the Court of Appeals cases in Wallstein and Fuji suggest the same result, as do some of the – to the extent it's of interest to the Court. What does loss mean? If loss or damage presumably means something different, what do they mean? It does mean something different. It means permanent dispossession. That's what this Court found in Mud Pie. That's what the other courts that have addressed the issue have interpreted to mean. So a loss – first of all, for example, in the Wen case, the only insured property is the business personal property. They didn't own the building. So if any of that property is stolen, then that would be lost, not damaged. If it were a building that were insured and it were burned to the ground, that would be a loss. We wouldn't call it a damaged building. We'd call that a lost building. You wouldn't say my building was damaged. If it burned to the ground, you'd say it was lost. So loss does have a different meaning because otherwise it wouldn't pick up the theft. And that was the whole point of the Nautilus decision, which the Washington decision cited in the Bridge, where the court said, no, loss doesn't just mean physical alteration or destruction. It can mean dispossession also. Interestingly, the Nautilus decision is a very interesting parallel to the intermodal decision in California because intermodal decided the same thing. Loss must mean something in addition to material physical alteration. It means dispossession also. And the trial court in Mud Pie addressed that and discussed it at length, and this court simply adopted in its decision the proposition that loss means either complete destruction or dispossession, dispossession by theft or otherwise. There are five reasons why this issue has been decided unanimously by all the other courts. First, the plaintiff ignores this. It's not unanimously, so let's not overstate things. No, it has been unanimous. There's two cases. I'm talking about the Court of Appeals, by the federal court's appeal. The appellate courts, the federal and state appellate courts, have decided unanimously that direct physical loss does not mean loss of use. There are two decisions out there which are going back and forth on whether virus on the premises could, under certain circumstances, be a direct physical loss, but that's not before this case, and those two decisions are outliers. One of them is in California with conflicting appellate authority. But none of those, there's no case in the country, no appellate case in the country that said that direct physical loss means loss of use, and there's no appellate case in the country that says the virus exclusion does not apply to a business that is suspended because of an order of a governmental authority ordering it to either cease its operations or, in these cases that are before the court right now, simply restrict its operations. These businesses actually stayed open. It wouldn't have made any difference if they had had to close. We'd have the same result either way. But the fact that they actually opened the court when appellant's counsel was up a few minutes ago and was saying access was prohibited or restricted, it wasn't. There's nothing stopping people from coming to the dental office. You couldn't use the premises, forgive me, Judge Brewster, as a dining room, right? He couldn't have in-room dining. That's what he argued. Do you want to respond to that? That's right. A restriction of use is not a physical loss of property. Suppose the government, instead of issuing an order, had gone around and put up plywood barriers at each building and said no entry COVID. Would that be different? No, not plywood barriers because the property had not been physically altered. Now, if they broke down windows or did something physically to damage the property, that would be a different question. Isn't the hypothetical positing a barrier, a barricade? Yes, a barricade. Wouldn't that be a physical alteration? The barricade would not, if we're building, again, let's break this down. These policies ensure business personal property. If there were a barrier around the property, the property would not be physically lost. It would still exist. The plaintiff would own it. It's like a strange policy that it makes a difference whether you physically can't get in because there's a fence around it that you didn't put there or you physically can't get in because there's glass on the floor. Well, if you lose ownership of it or you lose possession of it and your loss is physical, in other words, the cause of your loss is physical in nature. Yeah, I physically can't get in my building. Right. I mean, the physical barrier, is that a loss of the property, a physical loss of the property? It's a close question. It's not the question before this court right now. It does make the question before us somewhat closer than you might think otherwise, if you think about it, because the difference between putting up an actual barrier and saying you're going to go to jail if you go in isn't all that different. Well, the difference is there's something physical that's stopping you from going in as opposed to the government just saying you can't go in. And words mean something. And the words in the policy is the property has to be physically lost. You have to be physically dispossessed of it, not just someone telling you you can't do certain things with it. And the best example or best metaphor, I think, to explain this is the Sixth Circuit decision in Santos where they said, well, if someone owns a bicycle, it would be one thing to say the bicycle was stolen and then it was lost, no question about it. It would be another if there was a curfew put in place and you weren't allowed to use the bicycle between midnight and 6 a.m. That would not be a physical loss of the bicycle. It would be a restriction of use very similar to what we have right now. Except this restriction arguably, I mean, just to talk about this, this restriction arguably lasted for months. So if you put the bicycle in a warehouse or, you know, behind a barricade and you can't have access to it for months, is that sufficient dispossession? If you physically took it away and put it in a warehouse, maybe you can make the argument that was a temporary physical loss. But if you simply say you can't ride the bicycle on the street for the entire winter months, that's not a loss of a bicycle. That's just a restriction on the use of a bicycle. There's nothing physical happened to the bicycle. But you don't think at any point the interruption in the ability to possess the bike becomes physical loss? Only if it becomes a permanent dispossession so that you don't own it anymore. So, you know, if that owner of the bicycle were confiscated and taken by the government and say we seized it because you owe taxes or whatever, then it would be physically lost. But then it's physically lost in the same sense as a nautilus. It's been stolen. It's gone forever. Right. Right. I'm just trying to poke around at whether there's anything short of that that is ever sufficient. And I guess maybe you've answered my question. Yeah, I mean, the nautilus decision is helpful. The intermodal decision in California is helpful. I mean, they talk about, no, we really need to not have dominion over it, not have a physical ability to use it and not own it. You can't sell it. You can't use it as collateral for a loan. You can't do the kinds of things one normally does in owning property. But simply using it would open a sort of a parade of horribles in terms of the different types of possibilities. I mean, let's just take a property where. I'm positing, forgive me for interrupting, but I'm positing the inability to use it, and I think Judge Berzon is too, the inability to use it for any purpose for an extended period of time. And it sounds like you're saying even if you can't, you can't get at it. You can't touch it. You can't use it. You can't access this property. Because of a physical force. Right. We just put up a barricade in front of it. That's what we just did. A barricade, as I said, would be a close call. That conceivably could be a physical loss if there's a barricade, a physical barricade that's been erected. Then can I ask, in the cases we're talking about, maybe you don't know about all of them. Maybe that's not a fair question. I was going to ask if there's any place for opposing counsel, maybe that. Are there any places, any examples here where we need to be thinking about when these cases come to us? Complete inability to access, the equivalent of a barricade. We can circle back to counsel. None of the traveler's cases do. The consolidated amended. Offices and restaurants and. . . There are dental offices and one restaurant. And the dental offices are allowed to. . . You're talking about just this caption case. Okay. That's fine. Which is, I think, six different plaintiffs. I think it's seven. It's made seven. It's a different place on my spreadsheet. I've got it. Thank you. Yeah, so none of the traveler's cases do where there's actually a complete inability. It wouldn't matter if the entire place was closed because it was ordered to be closed. I mean, it's the same issue as whether the order that causes a loss of use is covered. And it's pretty clear it's not. And if it were, just think of the kinds of things that can suspend a business, the operations of a business. Suppose a dentist lost his license, okay, and he can't use the property because he can't run the dentistry. Is that a physical loss of the property? Somebody could use the property. That's not. . . Pardon? He could rent out the property. That's a different story. He could rent out this property if he wanted to use it as residential property. I mean, it's not. . . You can always use it for something, but the business is not what's insured. The property is what's insured, and then the business is paid if it sustains loss as a result of the damage to the property. And that's the other place the plaintiff errs here. We have the graphic in our brief, the vertical chart of covered causal loss suspension. But that's just closer to a barrier in the sense that people can't come in. It's not just that you can't do dental work. You can't have people in the building, right? People can come in. The dentist can perform his trade. He's just restricted in which . . . Well, I understand that. . . . . . the scope of patients that he can serve or the scope of procedure. People who aren't there for that purpose, can they come in? They can come in. They just can't have dental work then. They can come in and sit in the waiting room. I don't know why anyone would. Well, certainly relatives could or whatever unless they have social distancing issues or whatever. And that's another problem with the civil authority claim is you need a prohibition of access. But we address that in our brief. But going back to these causal sequence, what they've done is . . . . . . of a covered causal loss covering a direct physical loss causing a suspension, which then causes the loss of income. What they've done is they've said, well, the causal loss, the loss, and the suspension are all the same thing. They're the governor's order saying you can't operate and you can't do certain things here. And that doesn't make any sense. The policy specifically says that the suspension must be caused by loss of or damage to property caused by a covered causal loss. If the suspension is the loss, that's not what the policy contemplates. One other textual clue, as some courts call it, in terms of why the loss of use doesn't mean direct physical loss is not loss of use . . . . . . is the loss settlement clause that talks about, okay, if you have a loss or damage to property, what do we pay you for? And they say, well, we pay you for either the replacement cost of the property or the actual cash value . . . . . . which is replacement cost less depreciation of the property. What do we pay? There's no claim here for property damage or loss or damage of property because . . . . . . and that's what's clearly contemplated by the policy because the property covered says . . . . . . replacement cost or actual cash value. And then the business interruption coverage says, well, if your business is suspended as a result of that loss or damage . . . . . . then we'll pay you additional for the loss of business. But, they don't have loss or damage to property. That red light is flashing because you're over time. Oh, it's over. I thought it was the third and finish line. That's all right. Thank you, Your Honor. Could you wrap up, please? Sure. So, unless the Court has further questions, we would request the Court take this up and decide it. We are recognizing it's the Court's discretion. It's not just the number of cases that are out there that decide these issues. It's the straightforward nature of those decisions as well as this Court's decision that we don't believe requires the Court to wait. But, if the Court should elect to wait, we're confident it will take the merits and decide it correctly. Thank you, Your Honor. Thank you. I don't have much time left, so I just want to respond briefly to a few things that counsel said. The first is I think there was perhaps an unintentional suggestion that the question whether viruses . . . . . . the presence, the physical presence of viruses constitutes direct physical loss or damage isn't before this Court. I think it is. That is the theory under the civil authority provision. The second thing I want to get to is the comment that what we're trying to do is trying to say that suspension and loss are the same thing. That actually ties into another hypothetical given by counsel, which is the loss of a license. I think those both suffer from the same infirmity, which is that what it's ignoring is not the . . . . . . is that here, the suspension was caused by physical limitations on the space. That is to say, limitations on the physical use of the space, whereas . . . That is a suggestion that if you want to have your friends come and sit in the waiting room, that's fine. Well, the problem with that, Your Honors, I think that that's a straightforwardly unreasonable interpretation of the insurance contract simply because . . . No, it's not. It's initially an interpretation of the order. It's true, of course, that if they can sit in the waiting room, I . . . Or even the dental chair, as long as nothing happens. I'm not actually sure whether that was actually . . . I'm not sure either, which is why I'm asking. Yeah, I'm sorry, Your Honor. I don't . . . Any answer I would give would just be a guess on that. But, I guess the other thing I just want to say before I close is that I think on behalf of my clients who have all suffered pretty badly . . . We appreciate the Court taking the time to hear these cases and devoting a whole day to them. So, thank you very much. We're not suffering. They're interesting cases. They're important cases. And, this is our job. Yeah, of course. Of course. The last thing I would like to say, though, is that I want to deal with the bike hypothetical partly because it's very interesting. You know, I think there are two problems there. I think the first problem is that the Sixth Circuit's hypothetical was, okay, suppose that a bike is forbidden from going on a sidewalk. Well, I think the easy response to that would be, well, can't you use it on the street? Whereas, here you don't have that kind of practical alternative use of an insured property. I think that's the distinction there. And, with that, I would just urge this Court to stay these cases and wait for a definitive answer from the Washington Supreme Court. Thank you very much. Anything further? Unless there are further questions. I don't think we have any further questions. Thank you, Counsel. We'll take this case under advisement and go on to the next one on the calendar.
judges: BERZON, CHRISTEN, FORREST